UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| CHARLES R. WILLIAMS, II, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:06-cv-1444-DFH-TAB |
| | ) | |
| MICHAEL J. ASTRUE,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff Charles R. Williams, II seeks judicial review of the Commissioner of Social Security's final decision denying him disability insurance benefits and supplemental security income under the Social Security Act.  An Administrative Law Judge ("ALJ") determined that although Mr. Williams suffered from the severe impairments of scoliosis, alcohol dependency, and personality disorder, he would have the residual functional capacity to do light work absent the abuse of alcohol. Under the stringent standard for disability under the Social Security Act, the ALJ concluded that he was not entitled to benefits.  As explained below, the ALJ's decision is affirmed because it is supported by substantial evidence.

---

[1]Michael J. Astrue took office as Commissioner of the Social Security Administration while Mr. Williams' case was pending before the court. Commissioner Astrue is substituted as the defendant in this action pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

*Background*

Mr. Williams was born in 1964 and has a high school education.  He has worked a number of different jobs, including as a laborer, grocery bagger, furniture mover, steel cutter, auto worker, and housekeeper.  R. 92.  Mr. Williams applied for disability insurance benefits and supplemental security income on January 28, 2003, complaining of scoliosis of the spine, pinched nerves in the neck, deteriorating joints, and emotional and learning handicaps.  R. 91.  He claims he became disabled on May 1, 1995.  R. 62.  This was around the time he stopped working as an auto worker for the Ford Motor Company.  There are conflicting reports about why Mr. Williams left Ford.  According to his testimony at the administrative hearing, he quit because of back pain and heavy drinking.  R. 489.  He told doctors in 1995, however, that he had quit because "I was bored and didn't like my shift."  R. 214.

I.     *Back and Neck Pain*

The first evidence of back and neck pain dates from March 1995, when Mr. Williams was working for Ford.  Mr. Williams saw a chiropractor complaining of back and neck pain.  He was diagnosed with a cervical sprain and chronic scoliosis. R. 111. The chiropractor prescribed light exercise, rest, and ultrasound therapy.  *Id.*  He concluded that Mr. Williams would be permanently restricted from heavy lifting.  *Id.*

-2-

Mr. Williams was also seen for an x-ray at Hancock Memorial Hospital around this same time.  The examination revealed slight rotoscoliosis of the lumbar spine.  R. 381.  Disc spaces appeared fairly well preserved.  *Id.*  While there was a scoliotic curve, Mr. Williams was otherwise negative for lumbar-spinal issues.  *Id.*  Mr. Williams' range of motion, reflexes, and strength were normal.  R. 387.

In late March 1995, Mr. Williams was seen on referral by Dr. George Siderys at Community Orthopaedics.  Dr. Siderys noted that Mr. Williams had a ten-year history of scoliosis.  R. 389.  A physical exam showed normal lower extremity strength, as well as normal reflexes, flexion, and gait.  *Id.*  Dr. Siderys concluded that Mr. Williams suffered from atypical back pain and mild scoliosis.  In April 1995, Mr. Williams returned to work and reported that at least the cervical sprain was resolved.  R. 152.

After Mr. Williams applied for Social Security benefits, he was examined by Dr. Rita Coram (the state agency consulting physician)in March 2003.  Dr. Coram performed a physical exam and found no gait abnormalities.  Mr. Williams could walk on his heels and toes, tandem walk, hop, squat, and rise from a squatting position without difficulty.  R. 367.  His range of motion was normal on all counts. He had full muscle strength and normal reflexes.  Summarizing her findings, Dr. Coram concluded that Mr. Williams' physical problems would cause him a "mild level of disability with his life activities."  *Id.*  Dr. W. Bastnagel opined in March

2003 that the record did not indicate that Mr. Williams had a severe physical impairment.  R. 357.

In January 2004, Mr. Williams was seen at Hancock Memorial Hospital complaining of lower back and neck pain after slipping and falling on wet pavement.   X-rays revealed no evidence of acute fracture, no evidence of prevertebral soft tissue swelling, and "mild facet and uncovertable degenerative changes."  R. 163.  He was advised not to engage in lifting for a period of time.

II.   *Psychological Issues*

The medical evidence regarding Mr. Williams' psychological issues covers approximately the same period as that for his back and neck pain.  In September 1995, the police brought Mr. Williams to Gallahue Mental Health Services after his grandmother reported that he was hallucinating and becoming violent at home. R. 202.  Mr. Williams indicated that he was feeling depressed, suicidal, and had ingested mouthwash in combination with Tylenol and alcohol.  R. 214.  He was diagnosed initially with alcohol dependence.  R. 217.  Over four days, Mr. Williams received treatment for alcohol abuse.  Examinations during that time indicated he was of average intelligence and displayed no cognitive defects.  R. 216.  He was prescribed a course of Antabuse (also known as disulfiram) and multivitamins. R. 230.

In August 1997, Mr. Williams returned to Gallahue to seek treatment for a suicide attempt and alcohol abuse. R. 168. He was diagnosed with alcohol dependence, depressive disorder, and borderline intellectual functioning. R. 175. The primary therapist assigned a GAF score of 40. *Id.*[2] During intake, he listed having been molested by an older man when he was 13 or 14. R. 180.

After Mr. Williams applied for benefits, he was examined by psychologist Dr. Michael O'Brien on behalf of the state. Mr. Williams reported depressive symptoms such as sadness, insomnia, and difficulty with short term memory. Mr. Williams reported having symptoms of depression beginning at 14 years old. Dr. O'Brien observed that Mr. Williams' mood and affect were normal and his thought processes seemed clear and logical. R. 362. His speech was within normal limits and "his conversational vocabulary was remarkably good, given his educational level," though he had difficulty with recent memory and calculations. *Id.* When asked about his activity level, he reported sweeping, dusting, cooking, doing laundry, and mowing the lawn around the house. R. 363. For leisure he would read and go for walks. Dr. O'Brien diagnosed recurrent moderate major depressive disorder and alcohol abuse in early remission. He assigned a GAF score of 55, *id.*, indicating "moderate symptoms (e.g., flat affect and circumstantial

---

[2]GAF stands for Global Assessment of Functioning. It is a mental health rating that estimates a person's psychological, social, and occupational capacities. American Psychological Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. Text Revision 2000). A GAF of 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *Id.* at 34.

speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.  In May 2003, Dr. W. Shipley reviewed the medical record and opined that Mr. Williams suffered from "MDD" (major depressive disorder), R. 346, but that it did not rise to the level of a severe impairment.  R. 343.

After Mr. Williams' initial administrative hearing in December 2004, the ALJ ordered an additional psychological exam.  Mr. Williams was examined in February 2005 by psychologist Dr. Ceola Berry.  Mr. Williams reported that he had not used alcohol for the past ten months (since March 2004); Dr. Berry expressed some doubt about the truth of Mr. Williams' report.  R. 459.  Mr. Williams stated that he could care for his personal needs but that his parents did the cooking, cleaning, and laundry.  His IQ was average and he retained short-term and long-term memory.  Dr. Berry assigned a GAF score of 68, R. 461, indicating "Some mild symptoms . . . or some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 34.  Dr. Berry opined that Mr. Williams, when using alcohol, would have "marked" limitations in his ability to interact appropriately with the public and co-workers, along with extreme limitations in his ability to interact appropriately with supervisors, to respond appropriately to work pressures, and to respond appropriately to changes in a routine work setting.  R. 463.  If Mr. Berry were to abstain from alcohol, Dr. Berry found, he

would be able to understand and accept criticism and give substantial work effort. R. 464.

III.    *Testimony at the Hearing*

At the administrative hearing, Mr. Williams testified that he lived with his parents and had made a final, short-term attempt to work in January 1997.  R. 488.  This attempt was cut short due to extreme back pain.  R. 488-89.  His last long term employment was with the Ford Motor Company.  When he stopped working for Ford, he claimed having back pain, R. 489, and a serious alcohol problem.  R. 490 ("If it'd been the summer of 1995 my mind was so clogged, my mind was so unfocused with alcohol").

Mr. Williams testified that his back began bothering him around 1989.  The last time he sought treatment for the pain was in 1995, despite the alleged pain. R. 491.  He characterized his pain as an "eight or perhaps a nine" on a ten point scale.  *Id.*  He said he could sit for fifteen minutes, stand for ten to fifteen minutes, and walk about thirty feet without discomfort.  R. 492.  He testified that he could take care of his own personal needs, such as showering and shaving.  When asked the main reason he could not work, Mr. Williams answered:  "I would have to say it's my back problem."  R. 495.

Mr. Williams then testified about his psychological issues.  He stated that as a child he had been diagnosed with emotional problems.  R. 498.  He had a

history of suicidal thoughts.  Mr. Williams testified that due to these emotional problems, he lived an isolated existence.

The ALJ also heard testimony from Mr. Williams' mother.  She testified that Mr. Williams was unable to work consistently because of the pain in his neck and lower back.  R. 502.  She testified that her son could do most things for himself except for handling finances.  R. 503.

Two expert witnesses offered testimony during the hearing.  Dr. Paul Schneider testified about Mr. Williams' physical limitations.  Dr. Schneider stated that Mr. Williams suffered from mild scoliosis of the cervical spine and some lumbar scoliosis with no sign of spondylolisthesis.  R. 508.  He reviewed x-rays from 1995 and 2004 which showed mild degenerative conditions.  R. 508-09. Based on a review of the record, Dr. Schneider testified that Mr. Williams had the residual functional capacity to perform light work.  R. 510.  The ALJ posed the following hypothetical question to vocational expert Gail Ditmore:

> Let me ask you to assume I have a hypothetical individual of claimant's age, education, work experience, who can do work at the light level.  But this individual can do no more than occasional bending, squatting, kneeling, stooping, and crawling.  In addition, this individual is restricted to simple and repetitive work.  Do we have any jobs in this region for such a person?

R. 511.  Ditmore testified that such a person could work as an assembler, for which 2500 jobs existed when accounting for the listed restrictions.  She testified also that such an individual could work as an unskilled inspector, hand sorter,

or restaurant host.  R. 512.  The ALJ then modified the hypothetical question: "Let me ask you to further assume that this individual should have no more than superficial interaction with the general public, co-workers, and supervisors.  Will that change your answers?"  Ditmore testified that such a person would still be able to do work as an assembler, inspector, and hand sorter,  but not as a restaurant host.  *Id.*

IV.    *Procedural History*

Mr.  Williams  filed  for  disability  insurance  benefits  and  supplemental security income on January 28, 2003.  ALJ Peter C. Americanos issued his decision  denying  Mr.  Williams'  application.  R.  10-18.  Because  the  Appeals Council denied further review of the ALJ's decision, R. 3-5, the ALJ's decision is treated as the final decision of the Commissioner.  See *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  Mr. Williams filed a timely petition for judicial review.  The court has jurisdiction in the matter under 42 U.S.C. § 405(g).

*The Disability Standard*

To be eligible for Social Security disability benefits, Mr. Williams must demonstrate that he was unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that had lasted or could be expected to last for a

continuous period of not less than 12 months.  42 U.S.C. § 423(d).  In general, Mr. Williams could establish disability only if his impairments were of such severity that he was unable to perform both his previous work and any other substantial work available in the national economy.  20 C.F.R. §§ 404.1520(f) and (g).

This eligibility standard is stringent.  Unlike many private disability insurance programs, the Social Security Act does not contemplate degrees of disability and does not allow for an award based on a partial disability.  *Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1989).  The Act provides important assistance for some of the most disadvantaged members of American society.  But before tax dollars – including tax dollars paid by others who work despite serious and painful impairments – are available as disability benefits, it must be clear that the claimant has an impairment severe enough to prevent him from performing virtually any kind of work.  Under the statutory standard, these benefits are available only as a matter of nearly last resort.

The implementing regulations for the Act provide the familiar five-step process to evaluate disability.  The steps are:

(1)   Has the claimant engaged in substantial gainful activity?  If so, he was not disabled.

(2)   If not, did the claimant have an impairment or combination of impairments that are severe?  If not, he was not disabled.

(3)   If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

(4)    If not, could the claimant do his past relevant work?  If so, he was not disabled.

(5)    If not, could the claimant perform other work given his residual functional capacity, age, education, and experience?  If so, then he was not disabled.  If not, he was disabled.

See generally 20 C.F.R. § 404.1520.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

## Standard of Review

If the Commissioner's decision is both supported by substantial evidence and based on the proper legal criteria, it must be upheld by a reviewing court. 42 U.S.C. § 405(g); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), citing *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering the facts or the credibility of the witnesses.  *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000); *Luna*, 22 F.3d at 689 (7th Cir. 1994).  The court must examine the evidence that favors the claimant as well as the evidence that supports the Commissioner's conclusion.  *Zurawski*, 245 F.3d at 888.  Where conflicting evidence allows reasonable minds

to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of the conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). Also, the ALJ must explain the decision with "enough detail and clarity to permit meaningful appellate review." *Briscoe*, 425 F.3d at 351.

*Discussion*

I.   *ALJ's Assessment of Mr. Williams' Alcoholism*

Mr. Williams first questions the ALJ's determination that alcoholism was a contributing material factor to his inability to work. The statutes and regulations governing Social Security benefits now take a strict approach to alcoholism and drug abuse; if either is deemed to be a material contributing factor to a claimant's disability, the claimant is not entitled to benefits. See 42 U.S.C. § 423(d)(2)(C) ("An individual shall not be considered to be disabled for purposes of this title if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled"). The ALJ makes this determination by first evaluating whether the claimant is disabled under the Social Security Act. If so, the ALJ then must evaluate which of the claimant's current physical and mental limitations would remain if he stopped using drugs

or alcohol and must then determine whether any or all of the claimant's remaining limitations would be disabling.  20 C.F.R. § 404.1535(b)(2).  If the ALJ determines that, absent the drug or alcohol abuse, the claimant's remaining limitations are not disabling, then he is not entitled to benefits.

The ALJ determined at step three that Mr. Williams was presumptively disabled because his alcohol dependency resulted in a personality disorder sufficiently severe to meet Listing 12.09(D).  To meet Listing 12.09(D), a claimant must exhibit:  "Behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system."  20 C.F.R. pt. 404, subpt. P, App'x 1.  These changes are sufficiently severe if they bring about personality disorder as detailed in Listing 12.08, among others.  *Id.*  Here, the ALJ found that when using alcohol, Mr. Williams met the Commissioner's criteria for personality disorder with "marked deficiencies in social functioning and concentration, persistence or pace.  Specifically, he is unable to complete tasks timely or to sustain work effort.  He is unable to interact appropriately with supervisors, co-workers and the public and cannot respond appropriately to work pressures or to changes in a routine work setting."  R. 13; see also Listing 12.08 (criteria for finding personality disorder).  The ALJ also found that Mr. Williams had a serious physical limitation due to scoliosis.

The ALJ then assessed Mr. Williams' residual functional capacity absent the use of alcohol:

-13-

> the claimant's scoliosis precludes heavy and medium exertional activities, but not light.  The specific features of the claimant's personality disorder preclude him from performing work that requires more than superficial interaction with the public, co-workers, and supervisors.  They do not prevent him from jobs that do not involve such interpersonal interactions.

R. 15.  The vocational expert testified that within these parameters, Mr. Williams would still be able to perform a number of jobs in the national economy.

Mr. Williams argues that the ALJ erred in finding that alcoholism was a contributing material factor in his inability to work because his other limitations should have been serious enough to render him disabled.  This argument fails, however, because substantial evidence supports the ALJ's determination that Mr. Williams would be capable of restricted light work absent the use of alcohol.

The ALJ evaluated extensively what Mr. Williams' mental limitations would be without the abuse of alcohol.  Prior to becoming an alcoholic,[3] Mr. Williams could handle significant responsibility:

> claimant moved to his maternal grandmother's home in 1985 to take care of the household, including an uncle.  He fixed meals, did the dishes, laundry, cleaning, and yard work and also weekly volunteer work stocking shelves and helping clients at a food pantry in exchange for food and household supplies.  He got along well with the clients, co-workers, his neighbors, and parents . . . .  After high school he did very well in college preparatory mathematics, but did not take any other such courses.

--------

[3]Mr. Williams stated that he began abusing alcohol in order to deal with his back pain from scoliosis.  R. 489.  The problems with scoliosis and alcoholism began in 1989.  R. 490.

R. 16.  The ALJ also credited the evaluation of Dr. Ceola Berry.  R. 14.  Dr. Berry examined Mr. Williams in February 2005, roughly ten months after he claimed to have gone sober.  Dr. Berry assigned a GAF score of 68, indicating only "some mild symptoms (e.g. depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful relationships." DSM-IV at 34.  Dr. Berry opined that Mr. Williams, if sober, would be "able to give substantial work effort."  R. 472.  Mr. Williams himself down-played the impact of his mental limitations:  "At the hearing, the claimant testified that his biggest problem is his back and that depression is secondary."  R. 16.  In evaluating this evidence, ALJ found:  "There is no evidence of intellectual deficiency, but to accommodate any potential interference from the claimant's personality disorder, I have limited him to simple and repetitive work."  R. 15.  The ALJ's treatment of Mr. Williams' mental limitations was both reasonable and consistent with the record.

The ALJ had a sufficient basis for finding that Mr. Williams' physical limitations would allow work, apart from his alcohol abuse.  Despite Mr. Williams' claims that his back pain made work impossible, medical examinations showed that Mr. Williams had "full muscle strength throughout and full range of motion. His gait and station are normal, steady, and not ataxic without the use of an assistive device."  R. 15.  Mr. Williams had normal grip strength with normal fine finger manipulation.  Id.  Medical expert Dr. Paul Schneider reviewed the entire

record, listened to the administrative hearing, and testified that the scoliosis was "mild," R. 508, and that light work was possible. R. 510. X-rays taken in 1993, 1994, and 2004 were consistent with his opinion. *Id.* Because the medical evidence belied the full scope of Mr. Williams' subjective complaints, the ALJ credited his claims only to the extent that pain would rule out medium and heavy work. Because ample evidence supported these findings, the ALJ did not err by concluding that Mr. Williams would not be disabled – either physically and/or mentally – but for alcohol abuse.

II.    *History of Sexual Abuse*

Mr. Williams also argues the ALJ erred by failing to consider sufficiently the impact of past sexual abuse on his mental limitations.[4] An ALJ is not required to provide an in-depth analysis of every piece of evidence the claimant provides. *Diaz*, 55 F.3d at 307-08; *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984). The question is whether the reasons given by the trier of fact build an accurate and logical bridge between the evidence and the result. *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). "An ALJ's failure to consider an entire line of evidence falls below the minimal level of articulation required." *Diaz*, 55 F.3d at 307, citing *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The minimal

---

[4]The record contains few references to sexual abuse. On a client intake form for a mental health clinic, Mr. Williams wrote: "I was molested at age 13-14 by an older man." R. 403. He argues that this trauma had "obvious repercussions" on his depression and alcoholism, Pl. Br. 11-12, yet he did not raise this issue despite numerous opportunities to do so.

articulation standard is met when the court can "track the ALJ's reasoning and be assured that the ALJ considered the important evidence." *Diaz*, 55 F.3d at 308, quoting *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995); cf. *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (minimal articulation standard not met where court was unable to discern how the ALJ arrived at his findings apart from substituting his own judgment for medical evidence). A court reviewing the ALJ's opinion should give it "a commonsensical reading rather than nitpicking at it." *Shramek*, 226 F.3d at 811, quoting *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999). Remand is appropriate only when the ALJ's decision is "in a word, unreasoned." *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998).

While the ALJ did not specifically mention Mr. Williams' past sexual abuse, his opinion demonstrates that he took it into account when assessing the claimant's remaining ability to do work. In determining Mr. Williams' mental residual functional capacity, the ALJ relied on the findings of Dr. Berry, whom he reasonably "credited above all others." R. 14. As previously discussed, Dr. Berry had interviewed Mr. Williams in February 2005 and determined that he had only mild limitations. R. 459-61. During the course of his evaluation, Mr. Williams stated:

> I've been sexually and emotionally abused . . . those thoughts are hard to get rid of. When I have flashbacks, I have trouble getting my breath. I don't like to be around people or go new places. I'm always anxious, agitated, nervous and tense . . . I'm angry all the time. I have no interest, desire or function to be sexual.

R. 460.  In light of the examination and Mr. Williams' self-report, Dr. Berry diagnosed him with a personality disorder.  Dr. Berry nevertheless assigned a relatively high GAF score, which ultimately informed the ALJ's decision.  At the administrative hearing, Mr. Williams had an opportunity to discuss the full impact of depression and other mental problems on his ability to work.  He testified that his emotional problems were "a secondary thing" to his back pain.  R. 495. Because the ALJ's decision cannot be described as "unreasoned" simply because of his failure to mention specifically Mr. Williams' past incident of abuse,  remand is not required.

III.    *ALJ's Hypothetical Question to the Vocational Expert*

Mr. Williams also argues that the ALJ erred at step five by failing to pose a complete hypothetical question to the vocational expert.  The key hypothetical question to the vocational expert must fully set forth the claimant's impairments, but only to the extent that the ALJ finds them to be credibly supported by the medical evidence in the record.  *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003); *Herron*, 19 F.3d at 337; *Cass v. Shalala*, 8 F.3d 552, 556 (7th Cir. 1993).

The ALJ found that, absent the use of alcohol, Mr. Williams retained the physical capability to do only light work.  The ALJ also found, based on Dr. Berry's examination, that the features of Mr. Williams' personality disorder would still preclude him from "performing work that requires more than superficial interaction with the public, co-workers, and supervisors.  They do not preclude

him from jobs that do not involve such interpersonal interactions." R. 15. As discussed earlier, this was a reasonable assessment based on the evidence.

Mr. Williams claims that the ALJ incorporated reference only to *physical* limitations in the hypothetical question, making "no reference to Williams' mental impairments." Pl. Br. 14. The record wholly and completely contradicts claimant's argument. Simply put, the ALJ's hypothetical question in this case incorporated all medically-supported functional limitations, whether physical or mental.[5] The ALJ first formulated a hypothetical question incorporating only physical impairments. The vocational expert testified that a person with those limitations could work as an unskilled assembler, inspector, hand sorter, and restaurant host. R. 512. The ALJ then added additional mental limitations to the hypothetical question:

> Okay. Let me ask you to further assume that this individual should have no more than superficial interaction with the general public, co-workers, and supervisors. Will that change your answers?

*Id.* The vocational expert testified that while such a person would be unable to work as a restaurant host, all other jobs would still be available. Because the ALJ

---

[5]Mr. Williams also argues that the ALJ should have convened a second administrative hearing because Dr. Berry's consultative psychological exam was performed *after* the initial hearing. Had Dr. Berry's findings conflicted with the ALJ's hypothetical question at the first hearing, perhaps a second hearing would have been warranted. However, nothing in Dr. Berry's findings required additional limitations beyond those posed to the vocational expert in the initial hearing.

included all functional limitations supported by the record, remand is unwarranted on this basis.

IV.   *State of Administrative Record*

Finally, Mr. Williams argues that the ALJ failed in his obligation to develop a full and fair record.  See, *e.g.*, *Smith v. HEW*, 587 F.2d 857, 860 (7th Cir. 1978); 20 C.F.R. § 404.927.  He contends the ALJ should have ordered an MRI scan to assess his neck pain, along with more psychological consultations to evaluate past molestation and personality disorder.  He also believes that the record should have included evidence of his treatment for childhood depression.[6]

Failure to develop a full and fair record can be "good cause" to remand for gathering of additional evidence.  *Thompson v. Sullivan*, 933 F.2d 581, 586 (7th Cir. 1991).  However, the Seventh Circuit has noted more than once "the difficulty of having a 'complete' record as 'one may always obtain another medical examination, seek the views of one more consultant, wait six months to see whether the claimant's condition changes, and so on.'"  *Luna*, 22 F.3d at 692, quoting *Kendrick v. Shalala*, 998 F.2d 455, 456-57 (7th Cir. 1993).  Courts should therefore respect the Commissioner's "reasoned judgment" regarding how much evidence to gather in a particular case.  *Luna*, 22 F.3d at 692.

---

[6]Mr. Williams has failed, however, to provide any documentation of these treatments, instead asking the court to speculate as to its relevance.

Social Security Administration regulations provide that if there is insufficient evidence from which the Commissioner can make a disability determination, the Commissioner should try to obtain additional evidence. 20 C.F.R. § 404.1527(c)(3).  In such situations, the Commissioner may purchase a consultative examination.  See 20 C.F.R. § 416.919a(b).  The Commissioner here purchased two such consultative examinations for Mr. Williams and considered the findings in evaluating Mr. Williams' disability claim.  In March 2003, Dr. Rita Coram evaluated Mr. Williams' physical condition.  She found only "mild scoliosis of the back with minimal lumbrosacral perispinal tenderness."  R. 367.  The claimant otherwise had no musculoskeletal anomalies or gait impairments.  The ALJ also found Mr. Williams' claims of debilitating pain were inconsistent with the fact that he had not sought any treatment for his back since 1995.  R. 16.  X-rays already in Mr. Williams' medical record from 1995 and 2004 showed no physical basis for Mr. Williams' subjective complaints.  In February 2005, Dr. Berry evaluated Mr. Williams' psychological condition.  As previously discussed, the subject of past childhood abuse was evaluated.  The psychologist concluded that Mr. Williams had only mild mental limitations.  The record already contained ample medical evidence allowing the ALJ to conclude reasonably that Mr. Williams remained capable of work.  The state of the record developed by the ALJ does not warrant remand.

*Conclusion*

Because the ALJ's decision was consistent with the law and supported by substantial evidence, the court affirms the Commissioner's decision.  The court will enter final judgment accordingly.


So ordered.


Date: August 13, 2007

_____

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana


Copies to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Thomas E. Williams
teqw@aol.com